JENNIE L. FARMER, APPELLANT, v. RAILWAY MAIL ASSOCIATION, A COR-
PORATION, RESPONDENT.—57 S. W. (2d) 744.

St. Louis Court of Appeals.   Opinion filed March 7, 1933.

Rehearing denied, March 21, 1933.

Writ of Certiorari denied by Supreme Court, April 20, 1933.

*Leahy, Saunders & Walther* and *J. L. London* for appellant.

*Holland, Lashly & Donnell* for respondent.

1084

SUTTON, C.—This is an action on an insurance policy issued by defendant, insuring plaintiff's husband against bodily injuries, resulting in death, received through external, violent, and accidental means.

The trial, with a jury, resulted in a verdict for plaintiff for $3,000, and judgment was entered accordingly. From the order of the court granting defendant a new trial, on the ground that defendant's instruction in the nature of a demurrer to the evidence ought to have been given, plaintiff appeals.

The insured died as the result of a sunstroke suffered on July 11, 1930. At the time of his death the insured was chief clerk of the Railway Mail Service in the City of St. Louis. How long he had been in this office is not shown, but he had been a postal clerk for about forty years.

Plaintiff testified that on the day the insured suffered the sunstroke he left his home to go to his work about seven o'clock in the morning; that this was the usual time that he left to go to his work; that when he left home that morning his general appearance so far as health was concerned was perfectly all right; that she next saw him about half past four or five when he came home in the afternoon;

that when he came home he was very nervous and his face was black or purple; that he was holding one hand to his throat and the other to his head; that he said: "I have had a sunstroke. It seemed as though something hit me down the street. I caught to the fence or tree. The first thing I thought was, 'Well, I am near enough home that if I should fall some one will know me and take me home.'" Plaintiff further testified that insured died about three o'clock on the morning of July 13, 1930.

Dr. John H. Coats testified, for plaintiff, that he called to see insured on the evening of July 11th, and found him with a temperature of 106, in convulsions, and in a semi-conscious state; that he made a diagnosis of sunstroke, and gave him the usual treatment for sunstroke; that sunstroke was the cause of his death.

Dr. R. B. H. Gradwohl testified, for plaintiff, as follows: "Sunstroke is an effect induced by the rays of the sun on the human body. It is a physical force which disturbs the heat regulatory mechanism of the body, that is, there is a center in the brain which normally controls the temperature by controlling the heat production and heat loss, and in this condition the mechanism is interfered with. I would say the cause of the death-dealing effects are due to the detention in the body of products that ought to be eliminated. In other words, this condition of sunstroke prevents the individual from throwing off poisonous substances through his skin, through his kidneys, through his bowels, and through his lungs. It is a physical agent that brings about this sunstroke. I do not consider sunstroke as a disease in a medical sense. I consider it a condition brought about by the application of a physical agent, because we do not see any tangible evidences of disease in the dead bodies of people that die of this condition. It is well called a disturbed physiology rather than a disease in the sense of gross organic changes. Sunstroke is a physical force applying its physical effects to two centers, really four little points at the base of the brain, which are called the heat regulatory centers. The physical force applying itself is the heat. By physical force I mean some agency outside the human body that effects, for the bad, the health and life of the individual. In other words, a normal individual is struck down by an agency that is not a disease. Sunstroke is not a disease.

July 11, 1930, was a hot day, the temperature ranging from eighty-seven degrees at seven o'clock in the morning to 103 degrees at four o'clock in the afternoon.

In support of the court's action in granting defendant a new trial, defendant first contends that sunstroke is a disease and not a bodily injury, so that insured's death resulting from sunstroke is not within the coverage of the policy sued on. That sunstroke is a disease and not a bodily injury appears to have been held in a number of cases, but these cases are out of accord with the decisions in this State and

the weight of authority elsewhere. [Richards v. Standard Accident Ins. Co., 58 Utah 622; Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S. W. 673; Kripplaben v. Greenspon's Sons Iron & Steel Co. (Mo. App.), 50 S. W. (2d) 752; Taylor v. City Ice & Fuel Co., recently decided by this court and not yet reported; Moran v. Peterson Const. Co., recently decided by this court and not yet reported; Morris v. Dexter Mfg. Co., 225 Mo. App. 449, 40 S. W. (2d) 750; Van Kirk v. Hume-Sinclair Coal Mining Co. (Mo. App.), 49 S. W. (2d) 631; Schulz v. Great Atlantic & Pacific Tea Co. (Mo.), 56 S. W. (2d) 126; State ex rel. Rau v. District Court, 138 Minn. 250, 164 N. W. 916; Lane v. Horn & Hardart Baking Co., 261 Pa. 329; Walsh v. River Spinning Co. (R. I.), 103 Atl. 1025; Young v. Western Furniture & Mfg. Co. (Neb.), 164 N. W. 712.]

In Schulz v. Great Atlantic & Pacific Tea Co., supra, the court, responding to the point expressly raised, definitely ruled that death resulting from heat prostration, or sunstroke, was death by accident, as defined in our Workmen's Compensation Act. This ruling, though the court does not in express terms so state, necessarily implies that death was the result of an injury as contradistinguished from disease, for the compensation act defines the word "accident," as used therein, to mean "an unexpected and unforeseen event happening suddenly and violently, . . . and producing at the time objective symptoms of an injury," and defines the term "injury" to mean "only violence to the physical structure of the body, and such disease or infection as naturally results therefrom." Under this definition obviously an injury, that is, "violence to the physical structure of the body," is an essential to a compensable accident under the act, and that disease is compensable only when it results from such injury, that is, "violence to the physical structure of the body."

That sunstroke results from the application of an external physical force can hardly be questioned. The action of the heat rays of the sun upon the body directly or indirectly is as much the action of a physical force as is the blowing of the wind. So that sunstroke, with respect to the manner of its infliction, has all the characteristics of an injury.

It appears that it was formerly the opinion of the medical profession that sunstroke, in its technical and pathological sense, was a disease, but modern science seems to have arrived at the conclusion that it is not a disease, but an injury, resulting from the application of physical force. But, whatever it may be technically, it is not regarded as a disease in the popular mind. In the popular understanding it is accounted a kind of violent personal injury. The word itself carries the idea of an injury by a sudden external force. It is a well established rule that in construing insurance policies, terms should be understood in their plain, ordinary, and popular sense, rather than in a technical or scientific sense. Therefore, in consonance wth this

rule, in construing the policy here in suit, sunstroke must be understood as an injury and not a disease.

Secondly, defendant contends that, conceding that the insured's death resulted from an accidental injury, yet the accidental injury was not received through accidental means, and the resulting death is therefore not within the coverage of the policy.

There are two lines of authorities extant announcing different rules. The one holds that where an unusual, unexpected, or unforeseen injury or death results by reason of the doing by the insured of an intentional act, where no mischange, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means. The other holds that where an unusual, unexpected, or unforeseen injury or death results from an intentional act of the insured, the ensuing injury or death is caused by accidental means, even though no mischance, slip, or mishap occurs in the doing of the act.

Our Supreme Court has adopted the first rule, overruling previous decisions of the appellate courts adopting the second rule. [Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S. W. 907.]

The different rules may be very well illustrated by the facts of a typical case, cited in the Caldwell case, as follows: The insured and others came out of a building and jumped from a platform four or five feet in height. The insured jumped last, and landed on his feet heavily and with a jar, thereby suffering a bodily injury from which he died. The first rule holds that, if in the act of jumping there was no mischance, slip, or mishap, or involuntary movement, turn, or strain of the body, then though the resulting injury was unintentional, unforeseen, and unexpected, and not the natural or probable consequence of the act of jumping, and was therefore an accidental injury, yet the means—the act of jumping—producing the injury was intentional and therefore not an accidental means. The second rule holds that since the injury was the unexpected or unforeseen, and not the natural or intended, result of the means—the act of jumping—which produced it, such injury is produced by accidental means.

It is obvious that the Caldwell case was decided on the theory that the surgical operation from which the death of the insured resulted was the intentional act of the insured, since the surgeon who performed the operation was acting as the agent of the insured, so that the means which caused the death of the insured was the means intentionally employed by the insured through his agent, who in performing the operation did just what he intended to do without any mishap occurring in the performance of the operation. Such a case is very different from a case where the means producing the injury or death is not the act of the insured, but is the action of extraneous forces. An examination of the sunstroke cases cited by counsel in

the present case discloses that the courts have sometimes overlooked this distinction, treating the act of the insured as the means producing the sunstroke, apparently oblivious of the fact that the means producing the sunstroke was the action of an extraneous physical force —the heat of the sun.

A few simple examples may serve to illustrate the distinction between injury resulting from the act of the insured and injury resulting from extraneous forces: The insured is unintentionally shot by another, or is intentionally struck down by an assassin from ambush, or he may be attacked by a breast or bitten by an insect, or he may be injured or killed by windstorm or flood, or he may be struck by lightning. In each such case the means—the extraneous force—as well as the resulting injury, is accidental. This being so, it ought to follow by analogy without question that where the insured is struck down by the action of the heat of the sun he is stricken by accidental means.

We have read many judicial definitions of "accidental" and "accidental means." These definitions, though expressed in a variety of phraseologies, all carry the idea of unintentional, that is, of course, unintentional on the part of the insured. One of the definitions we have found runs this way: "The words 'accidental means' do not mean simply that death shall be unintended or unexpected or unforeseen, but that the cause of death shall be accidental, and 'accidental' means happening or coming by chance, *or without design*, that is, casual or fortuitous, *as opposed to design or intention.*" Another says: "Death caused by some act of the insured not *designed* by him, or not *intentionally* done by him, is a death by accidental means. In other words, accidental death is an *unintended* and *undesigned* result arising from acts done, whereas death by accidental means is a result arising from acts *unintentionally* done." Another says: "It is not sufficient that there be an accidental—that is, an unusual and unanticipated—result. The means must be accidental, that is, *involuntary, unintended.*" Another says: "'Accidental' is a happening or coming by chance, *or without design*, casual, fortuitous, taking place unexpectedly, *unintentionally*, or out of the usual course." Another says: "Accidental is the antithesis of *intentional.*"

In the present case the insured went to his office on the day he was stricken at the usual time and in the usual way, using the street car for transportation, as was his custom. He worked at his desk in the morning in pursuit of his usual duties, walked to his lunch at a restaurant at the noon hour, and returned to work at his desk in the afternoon. At the conclusion of his work in the afternoon, he took the street car to return to his home as was his custom. On disembarking from the street car he undertook to walk from the street car to his home as he usually did. While on his way he was

stricken. It was an unusually hot day. We are not persuaded to the defendant's view that because the insured did nothing unintentional to cause the sunstroke he received, but pursued his usual activities during the day—in other words, did not run away from the heat, if this were possible—therefore the application of the heat forces to his body, which was the means that caused the sunstroke, was intentional on his part, and not accidental. This view makes the action of the insured the means producing the sunstroke, rather than the action of the sun's heat, which comes without the volition o⁵ any mortal being.

Moreover, as already said, insurance policies are prepared for public consumption and their terms must be understood according to the view of the popular mind, so that insurers may not put upon their policies one construction for the purpose of selling them, and another for the purpose of defeating liability when disaster befalls. There is no question that sunstroke, in the popular mind, is regarded as an injury resulting from accidental means, just as a lightning stroke is so regarded. The insurance companies know this when they sell their policies and collect the premiums thereon. If they desire to exclude sunstroke from the coverage of their policies, this can easily be done in express terms.

Many sunstroke cases have been brought to our attention by counsel. It would serve no useful purpose to review these cases in detail. An examination of them shows that the courts have taken divergent views on the question as to whether or not sunstroke is within the coverage of policies insuring against injuries received through accidental means, but we think the better reasoned cases support the view that sunstroke is within the coverage of such policies.

In Bryant v. Continental Casualty Co., 107 Texas, 582, 182 S. W. 673, the insured suffered a sunstroke on an unusually warm afternoon in August while walking upon the streets of Houston in the ordinary course of his occupation as a collector of accounts, and died from the sunstroke the day following. Discussing the means of the injury in that case the court said:

"The question might well be rested at this place, though the exposure to which the assured subjected himself be considered as 'the means' of his injury. It is a mistake, however, to indulge that assumption. Exposure to the heat is the cause of a sunstroke only in the sense that exposure to any kind of external force furnishes the occasion of an injury as the result of its operation. In cases arising under accident insurance policies, where possible negligence on the part of the assured does not affect the question of liability, the efficient cause of a sunstroke, the *vis major* which inflicts the injury, is necessarily the excessive heat; and it must, therefore, be deemed 'the means' of the injury. If it be solar heat, it is not caused, and, when operating naturally, is not controlled by human agency; and

under such circumstances it is impossible to associate with it the idea of its 'voluntary employment,' or to regard as not an accident an injury from it when suffered as here shown, in the sense that under certain conditions, as declared in the rule above noted, an injury resulting from a means voluntarily employed will not be so deemed.''

See also, as supporting this view: Richards v. Standard Accident Ins. Co., 58 Utah, 622; Continental Casualty Co. v. Bruden, 178 Ark. 683; Higgins v. Midland Casualty Co., 281 Ill. 431; Hutchcraft v. Travelers' Ins. Co., 87 Ky. 300, 8 S. W. 570; Elsey v. Fidelity & Casualty Co., 187 Ind. 447; Continental Casualty Co. v. Clark (Okla.), 173 Pac. 453; Gallagher v. Fidelity & Casualty Co. (N. Y.), 163 App. Div. 556; Continental Casualty Co. v. Johnson, 74 Kan. 129.

In the Richards case, supra, the court, after stating and approving the rule that the parties to a contract of insurance are conclusively presumed to have intended the terms used therein to be understood in their popular sense, said:

''Applying this rule to this policy, it is clearly manifest that sunstroke is covered by the words 'bodily injuries by accidental means.' It is difficult to escape this conclusion unless the popular conception of the words 'sunstroke' is to be considered only when the buyers procure insurance, and a different and technical conception of the same word is to be invoked when the insurance company seeks to escape liability.

''This rule of applying the popular meaning to words found in insurance policies is doubly strengthened when the additional rule is invoked that insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purpose of insurance.''

We conclude that death resulting from sunstroke is within the coverage of the policy in suit here.

The Commissioner recommends that the order of the circuit court granting defendant a new trial be reversed and the cause remanded with directions to said court to reinstate the judgment entered on the verdict of the jury.

PER CURIAM:—The foregoing opinion of SUTTON, C., is adopted as the opinion of the court. The order of the circuit court granting defendant a new trial is accordingly reversed, and the cause remanded with directions to said court to reinstate the judgment entered on the verdict of the jury. *Becker, P. J.,* and *Kane* and *McCullen, JJ.,* concur.