## POPE v. LINCOLN NAT. LIFE INS. CO.

## SAME v. COLUMBIAN NAT. LIFE INS. CO.

### Nos. 11069, 11070.

Circuit Court of Appeals, Eighth Circuit.
April 18, 1939.

J. L. London, of St. Louis, Mo. (S. C. Rogers and Leahy, Walther, Hecker and Ely, all of St. Louis, Mo., on the brief), for appellant.

James C. Jones, Jr., of St. Louis, Mo. (Lon O. Hocker, James C. Jones, Web A. Welker, and Jones, Hocker, Gladney and Grand, all of St. Louis, Mo., on the brief), for appellees.

Before STONE, WOODROUGH, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

Appellant, as beneficiary, brought an action for the death of Charles H. Pope against the Lincoln National Life Insurance Company on an accident policy. Appellant brought another action for the death of Pope against the Columbian Na-

tional Life Insurance Company on two accident policies. The cases were consolidated for trial. At the close of the evidence of plaintiff, verdicts were directed and judgments entered thereon for the respective defendants. From such judgments plaintiff brings these appeals which are presented on a single record.

Each appellee contends that none of the assignments of errors is sufficient to present any issue for review here. The assignments are as follows:

"1. The District Court erred in directing a verdict against plaintiff and in favor of defendant.

"2. The District Court erred in refusing to submit the case to the jury.

"3. The District Court erred in holding that as a matter of law plaintiff was not entitled to recover.

"4. The District Court erred in holding and ruling that the death of insured was not the result of accidental means within the provisions of the policy in question."

The argument of appellees is that each of the assignments is too general. Whether an assignment of error is so general as to be insufficient depends upon the character of issue it seeks to present to the appellate court. The measure of a sufficiently specific assignment is that it clearly challenges a definite ruling or action of the trial court—such ruling being as to a matter which this Court may properly examine and determine. The sufficiency of the evidence to justify direction of a verdict at the close of the evidence of plaintiff is certainly a matter which this Court can examine and determine. Therefore, the question here is whether any of the above assignments has clearly challenged the action of the trial court in so directing each of these verdicts. It is difficult to imagine how this appellant could more clearly and definitely challenge the direction of these verdicts than she has in the above assignments. In four different forms of expression she has endeavored to draw to our attention that she claims the trial court erred in directing such verdicts. Each and all of them present but the one issue—definitely and clearly—that there was sufficient evidence to compel submission to the jury.

The pertinent provision as to the risk insured against is stated in the Lincoln policy as: "bodily injury, effected solely through external, violent and accidental means and evidenced by a visible contusion or wound on the exterior of the body (except in case of drowning and internal injuries revealed by an autopsy)."

The provision in the Columbian policies is as follows: "bodily injuries effected directly and independently of all other causes through accidental means".

Under both of the above quoted policy provisions, the issue was whether there was sufficient evidence to justify a verdict of accidental death. Under the Lincoln policy there was the additional issue of whether the accidental means of death was "evidenced by a visible contusion or wound on the exterior of the body" or by "internal injuries revealed by an autopsy."

Viewed most favorably to the plaintiff, the fact situation shown by the testimony is as follows. Charles H. Pope, the insured, left St. Louis, alone in a La Salle sedan, the afternoon of November 3, 1934, to drive to his farm near Ironton, Missouri. Near the town of Bismarck, en route, he turned onto a road which had been recently laid out and graded but not yet surfaced with gravel. It had been raining and this road was very muddy. Other cars had used the road and there were ruts in the surface.

The evidence as to what took place upon the road is as follows: One witness saw him when he was about two hundred yards along the road. The car was stuck in the mud. "He seemed to have a terrible time, and I watched him until he got out." He "zigzagged" from there about eight hundred feet and stuck again. He had trouble there "going back and forth" but finally got out. "It looked like the car would get around every way, like he would go to back away and start it, and then he would come back again." This witness did not see Pope get out of the car—however, he was not watching constantly, being engaged at his barn. Another witness saw the car about three-fourths of a mile from Bismarck at about fifteen minutes before 5 o'clock. Before the car was in his sight he could hear it "stuck up" (this was, obviously, the first time testified to by the previous witness). When he first saw it, the car was again stuck:

"He got out of the car and walked around the car, and he got back in the car and tried it again, and I guess the first

time he was there about fifteen minutes, then he got out. He ran down the road and he noticed a bad place and he stopped before he got to the place and he got out and walked ahead of the car. He looked at the place, went back to the car, stood there, and went back and looked again, and he got in the car and he got through and he got about, oh, I guess about one hundred or one hundred and fifty yards and he stuck up again, and he was there a little bit longer. I wouldn't say for sure how long. It was 20 or 25 minutes when he finally did get out and he went along. There was a piece of woods on my side and I couldn't see but I heard he was stuck up. I heard him about an hour and a half and, of course, I went ahead with my work and never paid any more attention. The last place he was there altogether an hour and a half. He might have been there longer. Sometimes the engine was running. He was racing it, and stopped a while, and would do the same thing over.

"Q. Did you see him skidding on the road? A. He was the second place where he got through.

"He went kind of over the road, didn't stay in one place. He skidded from one side to the other. I wouldn't hardly say over what length or what distance I saw him skidding, but it was a little distance, maybe from here to the door or maybe longer, I guess about 30 feet or 40, something like that. It might have been a little bit longer. I did not see the car when it was turned around facing southwest, I didn't see that.

"It was kind of cloudy, but I don't think it was raining. It had been raining the day before. I don't know what time it had stopped raining. I don't recall that.

"Dr. Pope got a piece of wood the first time. He put it under the wheel but the wood was so soft he couldn't make it and he laid it in front of the hind wheels. I saw Dr. Pope at the wheel. He got in. I saw him driving the car. At the time he was skidding back and forth, he was at the wheel. He held the wheel, trying to get out of there. The road was so bad and he skidded, he couldn't hold the wheel straight in the road. He couldn't keep the car straight on the road."

## Cross-Examination.

"Q. Mr. Steffen, the last time he got hung up was what distance from where he was hung up the second time. A. Not the first time. The first time he stuck up on kind of high ground.

"Q. That is where you didn't see him? A. That was north.

"I didn't see that. The first time was right uphill. The first time I really saw him stuck up, when I saw him, that was, I guess, about, oh, about 500 yards from where that new road started from the north end. 500 yards from the north end of the road. That was not opposite my house. A little bit north. I guess, say about 50 feet north. Then he got out of there. I guess he went about 100 yards until I saw him stop again. He went about 100 yards, and it was then he got to that very bad place I was talking about; he got out to look the situation over. He walked back to his car, and walked down and looked it over again. Walked down and looked it over twice, and then started through it. He didn't stick up there. He got on through that place. After that I never saw him stuck up again. I never saw him any more after that, until he got down there. The last place where his car was found I couldn't see it from where I was."

About 7 o'clock, a third witness, who was driving his car toward Bismarck on this road, came upon the Pope car standing "almost square across the road", the front and rear ends about equal distant from the opposite sides of the road. Going up to the car, he found Pope dead— the body still warm.

"When I first saw Dr. Pope he was sitting at the steering wheel, his head back, tilted back some, his hat pushed a little bit on the back of his head, hands on the steering wheel, and he had his glasses on. His head was thrown back (demonstrating). It was about half-way back. His hat was not pushed back very much. About the way I usually wear mine. I don't remember whether his mouth was open or not. His eyes were almost closed. That was one of the ways I come to know he was dead. I noticed his eyelids were almost closed, but not entirely. I did not feel his pulse. I put my hand on his chest. I felt no heart movement.

\* \* \* \* \* \* \*

"I decided he was dead and I saw I couldn't get my car by, so it was then that I pushed him over in the seat so I could get under the wheel. I did not push him

over very much. Not enough to sit down entirely in the seat and drive the car. It was enough I could operate the car. When I pushed him over his head went over against the door and he was leaning at an angle close to about 45 degrees. I wouldn't say his head was against the door. I do not know whether it was or not. I don't know that one way or the other."

This witness testified as to the road condition that: "As to difficulties I encountered in going through that road, it was a matter of continually shifting gears, turning the steering wheel, using the brake, clutch, and foot accelerator, and wondering what was going to happen next. I skidded from the time I got on that road until I got off. However, I stayed out of the ditch. I finally went into the ditch exactly parallel, within 2 or 3 feet of, something like that of Doctor Pope's car."

From other witnesses (as well as this last witness) it appeared that Pope's car had skidded around into this position; that there were two or three fence rails which he seemed to have carried from the side of the road to one place in the road; that his shoes and trousers were muddy nearly to the knees; that there were no marks of injury on the car.

Insured was a practising physician, fifty-eight years old. He was athletic and muscular; very energetic and active; excitable if things did not go smoothly. About a year before, his car had skidded, turning over several times. He was slightly injured (not permanently) thereby and had an active fear of skidding thereafter. He had every appearance of health and had never been known to complain of any unhealthy condition. He did things (detailed in the testimony) requiring some physical exertion without evidencing fatigue, shortness of breath or other unfavorable effects.

Five slight abrasions were discovered on the right shin (one was about one-eighth inch in diameter and the others "about 1/16 or 1/8 inch in diameter")—these were present at the time of autopsy, four days later. There was a slight discolored spot on the forehead which disappeared with embalming that night. There was evidence that discolorations from bruises occurring after death would disappear with embalming.

An autopsy on November 7th, revealed no internal injury or rupture. The organs were in normal condition for a person of fifty-eight—showing "the average degree of sclerosis." The surgeon making the autopsy stated: "I have made a study of this case. Sections were taken from portions of the interior of this body, and I have looked at them through the microscope and studied them. I didn't find any pathology that would explain his death, without some other factor operation. I think that man could have gone on living for years with all of the conditions I found there. With reference to the changes that I found in that man's body with reference to normal changes I would expect to find in a man of 58, I would say that he had the typical appearance of a man of that age in respect to changes in his arterial system, average, I should say."

The autopsy surgeon and other doctors agreed that the cause of death was the effect upon the heart of exhaustion (from the physical exertion caused by the efforts to get the car along the road) and excitement (caused by the skidding of the car). They described this effect as "ventricular fibrillation". This term is explained by the autopsy surgeon as:

"My opinion of the cause of death of this man is this: Here was an individual who had been fatigued, tired out from all the exertion that was evidently in the question, who had a stress put on his heart wall by this exertion, who skidded around in his car, and in the excitement, with a heart already fatigued, and with the right wall, right chamber, prohibited, dilated, it called for ventricular fibrillation; that is, ventricular fibrillation due to the fact that the heart muscles couldn't react any longer, and this ventricular fibrillation was probably increased and irritated beyond endurance by the adrenal secretion which comes on in stages of excitement. That would be the way I construct my opinion of the death of this man, on an anatomical and physiological basis.

"There was nothing else, other than that, that could account for his death, in my judgment."

Another doctor testified, to the same effect, as follows:

"Doctor, I will ask you to state if you can render an opinion as to the cause of that man's death. A. Yes.

"Q. What is your opinion as to the cause of that man's death? A. Well, I

think that the man exhausted himself, or at least tired himself out in his attempt to extricate himself from this muddy road. That is, he got out and carried rails and walked in the mud, which doubtlessly must have been physically exhausting on his body, as well as on his heart. That when he arrived at the point where his car was found across the road—the car must have skidded. That the car must have skidded, I suppose, from the tracks. This skidding excited the man and that probably resulted in ventricular fibrillation.

"That is my opinion.

"I have had experience with the effect of excitement upon hearts. I think it is generally conceded excitement increases the adrenalin in the blood stream, and because of the nervous factor, stimulates the heart. That has been shown in experiments. I have performed some of the experiments myself. I have read upon the subject.

"Adrenalin is a substance secreted by the adrenal glands, especially under emotional disturbances. It stimulates the heart to increased activity, provided the heart is in a sufficient state to be stimulated. If it doesn't—the heart is tired—it will produce ventricular fibrillation.

"Regarding the mechanics of this ventricular fibrillation—what happens in the heart: Any muscle that is overworked, that is exhausted—in overwork you imply a chemical change; that it doesn't have enough food or enough nutrition, and that is the reason we rest. Therefore, when you stimulate something that hasn't the reserve, why, it reacts by fibrillary twitching in order to pour out the blood. The heart could not contract when the ventricles are fibrillating; the heart cannot contract, cannot pour blood into the aorta. The blood pressure drops and the patient dies.

"Dilatation is increased size of the contour or outline of the heart. It is a normal process. I think it probably—it must have taken place here. Any individual who works, his heart, which comes from a period of rest to a period of activity, his heart dilates, increases in size.

"Q. Doctor, the testimony in this case shows this man was found sitting in front of the wheel or behind the wheel, with his hands on the wheel, his head back. Would that be consistent with ventricular fibrillation? A. Yes, it would.

"It would not be consistent with an angina. As a rule, people with angina—which means a pain—people with cardiac pain or any type of pain, gall bladder difficulty, bend forward, and they usually, if they are standing or in an upright position, they usually, if they die, fall forward. In ventricular fibrillation the symptoms, most people die with them; very few ever regain consciousness at all, but the only sensation that has ever been recorded is a tightness of the chest; a feeling they cannot get enough air into their lungs. Consequently, one would expect an individual's head to be elevated, thrown back, perhaps, and that he would be sitting upright. Of course, that can't be an absolute rule; it would be only suggestive."

In this state of the evidence, was a prima facie case made on these policies? The Lincoln policy can be shortly disposed of. That policy required not only that the death should be "effected solely through external, violent and accidental means" but also that the bodily injury should be "evidenced by a visible contusion or wound on the exterior of the body (except in case of * * * internal injuries revealed by an autopsy)." Here the only contusions or wounds on the exterior of the body were a slight contusion on the forehead and five "slight, small abrasions" on the lower right leg. The leg abrasions clearly had nothing to do with the death and were regarded by the doctors as inconsequential. The contusion on the forehead was caused, obviously, by the head striking the car door when the witness, who discovered Pope in the car, pushed him over so that he (the witness) could get in and move the car. It disappeared after embalming. Also, the autopsy revealed no "internal injuries" whatsoever. The evidence not having shown compliance with this requirement in the policy of the Lincoln National Life Insurance Company, the verdict was properly directed as to that company.

The Columbian policies cover death "effected directly and independently of all other causes through accidental means." Under the evidence here there is no basis for any cause of death except that advanced by the doctors. Their theory is sufficiently supported by evidence to justify submission to a jury of the matter as to the death having been "effected" in the manner and from the causes recited. The

problem of whether this entire evidence justified submission to the jury is, therefore, whether a death so caused comes within the protection of these Columbian policies. That is, the question of whether a death so caused is "through accidental means", as stated in those policies. This is a matter of construction of those words in the policy, in view of the facts here. This depends upon the law of Missouri. Erie Railroad Co. v. Tompkins, 302 U.S. 671, 58 S.Ct. 50, 82 L.Ed. 518.

The here controlling law of Missouri is stated in Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56. That case was a suit, for accidental death, on a policy insuring against "bodily injuries, effected directly and independently of all other causes, through external, violent, and accidental means." The Columbian policies here differ only in the omission of the words "external, violent, and". Death was caused by thrombosis and intestinal obstruction following an operation for hernia. The determinative question in the case was whether death from such causes following an operation—admittedly skillfully performed without untoward happening—was within the policy. The decisive distinction was between an unexpected (accidental) result following an act (there the operation) intended by the insured and accidental means causing the death.

The Court stated, 305 Mo. at page 625, 267 S.W. at page 908, 39 A.L.R. 56:

"Notwithstanding the uncontradicted evidence of the exercise of the highest skill and care in performing the operation, an obstruction of the bowel occurred, which concededly caused insured's death 5 days later, and after a second operation had been performed in a futile effort to save his life. It is not here necessary to detail the evidence which plaintiff claims tended to show that insured came to his death as the result of the first operation to relieve the hernias. Assuming, for the purpose of the point now to be discussed, that the obstruction of the bowel and ensuing death were the unusual and unexpected results of the operation thus skillfully performed, can plaintiff recover under the terms of the contract of the accident insurance policies here involved?

"Before plaintiff can recover she must offer substantial evidence tending to show that her husband's death resulted 'from bodily injuries * * * through external, violent, and accidental means.' No question is raised as to the external and violent means. The sole question is what is meant by 'accidental means.'

"It cannot be doubted that what the surgeon did in performing the operation at the request and under the employment of insured was the act of insured, just as much as if insured had performed the operation with his own hands. This is true under the rule that what one does through another he does himself.

"There are two clearly defined lines of cases on this question. One holds that, where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.

"The other line of cases holds that, where injury or death is the unusual, unexpected, or unforeseen result of an intentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which caused such injury or death."

The above quoted statement is shortly followed by the conclusion of the Court (305 Mo. page 626, 267 S.W. page 908, 39 A.L.R. 56): "The Missouri decisions, which have discussed the question, have followed the second line of cases that, where the injury is the unexpected result of an intentional act, such injury should be considered as occurring through accidental means. All of such cases which may be said to have squarely decided the question, have been decided by the Kansas City and the St. Louis Courts of Appeals. Appellant contends that these cases are opposed to the great weight of the best-considered cases outside of Missouri, and asks that this court examine the question for itself and declare the law of Missouri upon the subject. I have spent a great deal of time and labor in studying the cases from this and other jurisdictions, and have come to the conclusion that appellant is correct in its contention, and that the rule in this state, so far as the law has been authoritatively declared by

our Courts of Appeals, is out of harmony with the best-considered cases elsewhere, and I think not in accord with sound reasoning."

After an extended review of authorities, the court stated (305 Mo. page 661, 267 S.W. page 921, 39 A.L.R. 56): "It is clear beyond cavil that plaintiff offered not the slightest proof that anything unforeseen, unusual, or unexpected occurred while the operation was being performed. She has offered only proof tending to show that an unforeseen, unusual, and unexpected result followed the performance of an apparently necessary surgical operation undertaken at request of insured and skillfully performed. She is therefore not entitled to recover and the judgment below should be reversed."[1]

In the present case the undisputed testimony is that the condition of this road was evident to the insured; that he encountered serious difficulty (being stuck in the mud for some minutes before he could get out) after he had gone only about two hundred yards on this road; that he proceeded forward for several hundred yards more with much difficulty until he again stuck in the mud; that again he went forward with great difficulty; that he was almost two hours in going about three-fourths of a mile to where he was found dead; that he could have gone another and a safe way. From this, it is clear that, with a choice open to him, he voluntarily chose this road instead of going the safe way and persisted thereon when there was no sufficient reason for so doing. Under these circumstances, he must be held to have intended to take the usual chances which must naturally be present in travelling such a road. If he did not fully appreciate the condition of the road when he entered upon it, he certainly ascertained it very soon afterward. With this knowledge, he persisted in trying to go forward. Except the death, nothing happened in his progress except what he or any other adult would know would naturally—if not inevitably—occur. He knew his endurance would be strained if he continued to try to go forward and that the car was likely to skid. There was no unexpected cause ("means") resulting in injury—such as the car turning over. The only thing which neither he nor anyone else would foresee was that this exertion and excitement would result in death. Up to this result (death), he must be held to have voluntarily encountered the situations and done the acts which led to conditions producing the unexpected result.

The facts here are squarely within the reasoning and the rule of the Caldwell case. That rule prevents recovery.

The judgment in each case must be and is affirmed.

[1] The Caldwell case has been followed or distinguished in many cases in the intermediate State Courts (Courts of Appeals). Among such cases are Gasperino v. Prudential Ins. Co. of America, Mo. App., 107 S.W.2d 819, 824; Marvin v. Yeomen Mut. Life Ins. Co., 230 Mo.App. 380, 91 S.W.2d 176, 177; Farmer v. Railway Mail Ass'n, 227 Mo.App. 1082, 1087, 57 S.W.2d 744, 746; Jennings v. National Life & Accident Ins. Co., 226 Mo.App. 777, 46 S.W.2d 226, 227; Berlan v. Metropolitan L. Ins. Co., 224 Mo. App. 938, 24 S.W.2d 686, 690; Guillod v. Kansas City Power & Light Co., 224 Mo.App. 382, 18 S.W.2d 97, 99; Cameron v. Mass. Protective Ass'n, 220 Mo. App. 780, 275 S.W. 988, 990, 991; Zach v. Fidelity & Casualty Co. of N. Y., Mo.App., 272 S.W. 995, 996.

To the same effect are cases in this Court—Order of United Commercial Travellers of America v. Shane, 8 Cir., 64 F.2d 55, 58, 59; Connecticut General L. Ins. Co. v. Allen, 8 Cir., 64 F.2d 840, 842; Lincoln Nat. L. Ins. Co. v. Erickson, 8 Cir., 42 F.2d 997, 1000, 1001, 1002.