## MULLANEY v. PRUDENTIAL INS. CO. OF NORTH AMERICA.

### No. 214–M.

District Court, S. D. Florida, Miami Division.
March 5, 1941.

Harold Kassewitz and E. F. P. Brigham, both of Miami, Fla., for plaintiff.

Shutts, Bowen, Simmons, Prevatt & Julian and L. S. Julian, all of Miami Fla., for defendant.

WALLER, District Judge.

This case was tried before the court without a jury upon the sole issue of whether or not Charles Joseph Mullaney came to his death by accidental means. Under the pleadings and admissions in the pre-trial conference, if the above issue is answered in the affirmative the plaintiff, beneficiary in a policy of insurance with double indemnity features, is entitled to recover $5,000 as double indemnity under the policy aforesaid, issued by the defendant. The facts are not in substantial dispute.

It appears that Charles W. Murray and his wife had attended a football game at night in the city of Miami. Upon attempting to drive their automobile under the porte-cochère of their home upon their return from the football game, they discovered a man lying across the driveway under the porte-cochère and barely stopped the automobile before running upon the prone figure. Attempt was made by Mr. Murray to arouse the intruder, who was later ascertained to be the insured, Charles Joseph Mullaney, but without success. He discovered certain papers protruding from the pocket of the insured and upon examination found some telephone bills among the papers, which included certain telephone numbers. Mrs. Murray was instructed to, and did, undertake to call two of these telephone numbers with a view of notifying the family or friends of Mullaney of his situation and to request that they come and take him away. No answer was obtained in response to either of the two telephone calls. Mullaney was in his shirt sleeves and it appeared he had vomited considerably near the spot where he was found lying.

Shortly after the effort to locate some of the acquaintances or family of the insured had failed, the insured arose from his prone position and engaged in cursing and the use of vile epithets toward Mr. and Mrs. Murray. Neither Mr. nor Mrs. Murray knew Mullaney, nor did the evidence show that Mullaney had ever seen Mr. or Mrs. Murray before. Mr. Murray attempted to get the intruder to leave, but instead Mullaney undertook to enter from the screen door leading from the porte-cochère onto the screened porch of the home of the Murrays, but when Mullaney attempted to enter through the screen door Mr. Murray pushed him away. Mullaney then walked toward the street at a point on or near the sidewalk, but there turned and came back. In the meantime, Mr. Murray had secured his pistol from some place in the house, but this did not deter Mullaney from his attempt to enter the house. After seeing Mr. Murray armed with a pistol Mullaney asserted that he would take the pistol away from Murray and would get him and "that whore". It appears that the insured then came through the screen door leading from the porte-cochère onto the screened porch of the Murray home and after enter-

ing upon the said porch the insured was shot and killed by Murray.

The evidence shows that Mullaney occasionally went on a two or three day drunk; that he started to drink the night before the night of his death; that he drank heavily at his bar room in the afternoon before his death, and left the bar room rather late in the afternoon with a bottle containing a fifth of a gallon of liquor. He later attended the first half of the same football game that the Murrays had attended and was drinking during the time he was at the football game. He left at the end of the half and was never seen again until found at the Murray home.

The court, from the testimony, is driven to the conclusion that Mullancy was drunk at the time of his death and that he was so under the influence of liquor as to be incapable of forming any conscious purpose or intent. In his hopelessly confused brain he doubtless mistook Mr. and Mrs. Murray for persons against whom he had some real or imaginary grievance. · However, they were total strangers. The fact that he used the vile epithet toward Mrs. Murray, whom he had never seen, and that he sought to do harm to his would-be benefactors, who hesitated to have him arrested, plus the fact that he doggedly continued to advance after seeing Mr. Murray armed with a pistol, which pistol the insured asserted he would take away from Murray, indicates that the insured was so drunk as to be bereft of reason and incapable of an act of conscious volition. Certain it is that a person in possession of reasonably normal mental faculties would not have conducted himself as the deceased did on the occasion in question.

Drunkenness is not an excuse or a complete defense in a criminal case, but in cases in which an intent is an essential element of the defense the jury may consider whether or not the defendant was so intoxicated as to have been robbed of any power or ability to form an intent. The court believes from the evidence in this case that the insured was so drunk as to be incapable of knowing what he was doing or trying to do, or that he was unable to realize that his acts were liable to cause his death.

The court further finds that the deceased was the aggressor in the affair that provoked his death, but the court doubts if he was the conscious aggressor in the affair.

### Conclusions of Law.

The foregoing gives rise to the following question: Whether one who, being insensibly drunk, provokes an assault in which he is slain, can be said to have come to his death "as a result, directly and independently of all other means, of bodily injuries effected solely through external, violent and accidental means".

The court is aware of cases that hold that when one becomes suddenly insane and in an act of violence is slain, recovery under such circumstances will not be denied to his beneficiary on a policy identical with the policy herein in question. Williams v. Prudential Insurance Company, 271 Ill.App. 532. The court is also aware of numerous decisions that permit recovery under similar policies where the insured is killed in an assault in which the insured is not the aggressor. The court has considered numerous cases differentiating between "accidental means" and "accidental results", but no case has been cited to the court dealing with facts identical with these under consideration. The nearest approach is the case of Raven Halls, Inc., v. United States Fidelity & Guaranty Company, 142 Misc. 454, 254 N.Y.S. 589. In the latter case the policeman was killed while "intoxicated", but the extent of his intoxication or the effect upon his ability to form a conscious purpose was not discussed. It is generally held that one who, as the aggressor in an assault, is killed cannot be said to have come to his death by accidental means "directly and independently of all other causes". It is also true that many policies of insurance provide that no payment should be made if the insured shall come to his death while drunk or while under the influence of liquor. No such provision has been called to the court's attention in the policy under consideration. We have, therefore, here the sole question of whether an insured can get so drunk as to relieve himself of any consequences, under the insurance policy, that may thereafter befall him. If this were true, when would an insured's responsibility cease and that of the insurance company come into operation? The issue would then be, how drunk was the insured? From the beneficiary's standpoint, the drunker the better. This surely cannot be the answer to such a question.

The insured was given to getting on periodical drunks of two or three days, according to the testimony of the bartender employed by the insured. The insured, therefore, having been drunk many times before, must have known the effect of the excessive use of intoxicating liquor. We do not have here a case of a novice in liq-

464

uor drinking, or one who was unfamiliar with the effects of excessive drinking. It would seem, therefore, that when one familiar with the effects consciously and knowingly begins the consumption of liquor and drinks himself into insensibility, such action consciously and knowingly sets in motion instrumentalities which he should have known at the beginning are often calculated to accidentally result in death or bodily harm. The condition in which Mullaney was found at the Murray home was brought about of his own volition, for which he and he alone is responsible. He knowingly set in motion the means, the sine qua non, without which his tragic death would not have occurred. If the beneficiary is to recover it must be in right of the insured. The insured, having consciously set in motion the instrumentality which led to his insensibility, could not claim that he became drunk by accident. At least, there is no proof in the record that he did. He came to his death by virtue of his drunkenness, and his drunkenness was not the result of accident, nor was his death.

There is also a line of cases which holds that where the insured is shot by another intentionally, the resulting death was not by accidental means. See Johnson v. Jefferson Standard Life Insurance Company, 4 Cir., 52 F.2d 829. In the present case Murray intended to shoot Mullaney, although he testified that he did not intend to kill him, but since he intended to shoot him, and death resulted, it could hardly be said that he did not intend the consequences of his act. So in either view of the case the same conclusion is reached.

It follows from the foregoing that the complaint should be, and the same is hereby, dismissed at the cost of the plaintiff.

Let an appropriate order be submitted.