ROBERTA CALLAHAN, an Individual and ROBERTA CALLAHAN, Guardian and Curator of NORMA L. CALLAHAN, a Minor, Appellants, v. CONNECTICUT GENERAL LIFE INSURANCE COMPANY, a Corporation. —No. 40429.—207 S. W. (2d) 279.

Division Two, December 8, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, January 12, 1948.

*Robert F. Sevier* and *White & Hall* for appellants.

188

*Henry I. Eager, Blackmar, Newkirk, Eager, Swanson & Midgley,* and *Lawson & Hale* for respondent; *B. M. Anderson* and *E. J. Mc-Alenney* of counsel.

BOHLING, C.—This cause was certified here by the Kansas City Court of Appeals because a constitutional issue is presented for determination. [281] (See, 201 S. W. 2d 406.) It is an action by Roberta Callahan, as an individual and as guardian and curator of Norma L. Callahan, a minor, the named beneficiaries (hereinafter designated plaintiff), under a double indemnity rider of an insurance policy issued on the life of Neel L. Callahan, the husband and father. Callahan's feet were frozen on December 13, 1944, which the attending physician stated was the prime cause of his death on December 26, 1944, with tetanus a seconary advent. The Connecticut General Life Insurance Company, a corporation, acknowledged its liability for the $2,500 straight life indemnity but denied liability under the $2,500 rider for death resulting from "bodily injuries effected directly and independently of all other causes through external, violent, and accidental means."[1]

Plaintiff had a verdict for $2,500 on the policy, $75 for interest, and $500 for attorney fees, and a judgment for $3,075. Insurer's motion for new trial was sustained and plaintiff appealed. The contested issues involve the submissibility of a case of death by "accidental means"; the admission of certain evidence, the giving and

---

[1] In greater detail, the policy provided:

"If the death of the Insured . . . results from accidental bodily injuries as defined below, the Company will . . . pay in addition to the face amount of this policy the sum of $2,500.

"Accidental Bodily Injuries are defined as bodily injuries effected directly and independently of all other causes through external, violent, and accidental means, where . . . there is a visible contusion or wound on the exterior of the body, and which independently and exclusively of all other causes result in the death of the Insured within ninety days from the date of the accident:

"Provided: that this section shall not cover death resulting directly or indirectly, wholly or partly, from: . . . bacterial infections (except pyogenic infections which shall occur with and through an accidental cut or wound) . . . ."

refusing of instructions, and whether Sec. 6040, R. S. 1939, authorizing recovery for vexatious delay now constitutes an undue burden on interstate commerce under Sec. 8, Art. I of the United States Constitution.

Mr. Callahan and Walter F. Millichip left North Kansas City in Callahan's Ford coach between 7:00 and 7:30 P. M. December 12, 1944, to see Dr. Earl K. Langford at Platte City on an American Legion matter. Callahan was an insurance agent, worked out of doors, was warmly dressed in an overcoat for the trip, was 45 years old and in good health. Arriving at Langford's between 9:00 and 10:00 P. M., they remained there for thirty minutes to an hour. Callahan was an experienced automobile driver but preferred to have others drive. He was not familiar with the highways around Platte City. Callahan had a bottle of liquor (a "fifth") in the automobile. They had a drink when they started and another at Langford's. Millichip stopped on the return trip at Coffey's tavern, about six miles south of Platte City. He lived at Houston Lake and wanted to get something to eat and a ride home from the tavern. Millichip headed Callahan's car back towards Platte City when he parked it. He testified Callahan, at the time, was awake and all right. Millichip expected to be in the tavern but a few minutes and Callahan remained in the car. Insurer's witness Clevenger, who left the tavern about this time, testified that from the movements of Callahan's head and shoulders he was then under the influence of liquor. Millichip met a number of acquaintances in the tavern. After ten or fifteen minutes he heard Callahan honking the horn, went to the window and motioned for him to come in. Callahan was gone when he went out ten or fifteen minutes later. Instead of turning south and proceeding to North Kansas City Callahan drove north on Highway 71. About 11:30 P. M. a Mr. Perry noticed the flash of lights from a car turning west off of the slab about 200 yards south of his service station and a mile or so north of Platte City, and at the edge of Tracy, a village of about 200. Within a minute or so a gasoline transport truck stopped at the car for fifteen or twenty minutes and put out flares. Perry did not go out to the car but soon closed his station and went home.

Callahan, in turning, permitted the front wheels of his car to go down into the slope [282] of the shallow highway ditch in such a manner as to place the bottom of the car on the ground and prevent moving it under its own power. The car was clear of the highway. There were no skid marks but marks where the wheels had spun in an effort to back out.

Highway 71 carries heavy traffic day and night. Two to four inches of snow was on the ground, and some ice on the highway, which was described as being very slick.

The temperature for the time involved ranged from thirty degrees at 11:00 P. M. December 12th, to twenty-two degrees at 9:00 A. M. December 13th; was twenty-four degrees at 12 noon, twenty-two degrees at 7:00 P. M. and 8:00 P. M., nineteen degrees at 9:00 P. M., eighteen degrees at 10:00 P. M., seventeen degrees at 11:00 P. M., and fourteen degrees at midnight, Decembr 13, 1944.

Insurer's witness Chandler testified he stopped at the car at 1:30 A. M.; that Callahan was intoxicated and had two quart liquor bottles, one empty; that he threw away the empty bottle and put the other on the floor back of the front seat; that he turned the lights on "dim", started the motor, pulled out the knob on the heater and left without waiting to ascertain the results, having been there about thirty minutes. Insurer's witnesses Groomer and Jones, who operated a fuel oil transport truck, testified in substance that they stopped at the car about 8:00 A. M.; that Callahan was drunk; that they had towing equipment but made no attempt to put the Ford back on the highway. About 2:00 o'clock that afternoon Chandler stopped again for two or three minutes and found Callahan lying in the front seat, his feet on the floor, and apparently asleep. He had his overcoat on but his shoes and socks were off. The sun was shining and it was warm in the car. Chandler felt Callahan's feet, they appeared to be all right, no frost bite, but he "didn't pay any particular attention." He did not disturb Callahan. Groomer and Jones passed the car again about 2:00 P. M. but could see no one inside. About 11:00 P. M. they stopped again at the car. Jones asked Callahan why they had not taken him out. Callahan feebly raised his head and said "help." Groomer informed the sheriff's office. Several witnesses testified the windows of Callahan's car had frosted over and one could not see through them.

Mr. Perry was township constable. At the request of the sheriff's office he investigated about 11:30 P. M. December 13, 1944, and found Callahan sitting in the front seat. Callahan said he was waiting for someone to "pull him in." It was very cold that evening and Callahan was cold. He had his overcoat on, but his hat, shoes and socks were off. His shoes appeared to be wet or water soaked. His feet "looked awfully white." He was rational but he could not walk. Perry carried him to his car and later helped to carry him into the sheriff's office. Perry did not detect any odor of liquor on Callahan or about Callahan's car.

Callahan was taken home and then to a hospital, where he died on December 26, 1944.

Insurer contends Callahan's death was not effected directly and independently of all other causes through accidental means; arguing that Callahan, after his automobile stalled, intentionally remained in his car with assistance readily available, and that his

death was the usual, natural, and probable result of this voluntary act and, hence, was not caused by accidental means.

There are two lines of decisions with respect to "accidental means" being distinguishable from "accident," "accidental result," "accidental death," "accidental injury," et cetera. One distinguishes between the terms as constituting the difference between cause and effect. The other rejects this distinction. Under the former, policies providing indemnity against injuries effected through "accidental means" do not cover an injury which is merely accidental in the sense it is unforeseen, undesigned, unusual or unexpected. The other decisions hold the terms legally synonymous, and make no distinction. They seek the intention of the parties in contracting and, absent explicit policy provisions making the distinction, stress the reasonable intentions and expectations of an ordinary business [283] man in purchasing accident insurance and consider that an accidental result must follow some accidental cause. Consult Annotation, 166 A. L. R. 476(IV).[2] Under the last-mentioned rulings plaintiff clearly made a submissible case.

This court en banc, however, in Caldwell v. Travelers' Ins. Co. (1924), 305 Mo. 619, 267 S. W. 907, 39 A. L. R. 56, distinguished between means or cause and result and denied recovery. Caldwell, the insured, died following a surgical operation on abdominal organs, performed with the highest skill and care, from an unusual and unexpected intestinal obstruction resulting from the operation. What the surgeon did was the act of Caldwell, the principal. (305 Mo. l. c. 625, 267 S. W. l. c. 908.) The holding, as we read the case, is "that plaintiff offered not the slightest proof that anything unforeseen, unusual or unexpected occurred while the operation was being performed. She has offered only proof tending to show that an unforeseen, unusual, and unexpected result followed the performance of an apparently necessary surgical operation undertaken at request of insured and skillfully performed." (Id., 661 and 921, respectively.) See also Pope v. Business Men's Assur. Co., 235 Mo. App. 263, 131 S. W. 2d 887. The Caldwell case reviews many cases. It makes observations supporting insured's position but we think they extend beyond its holding; as the court stressed the following quotation (305 Mo. l. c. 646, 267 S. W. l. c. 916) from U. S. Mutual Accident Ass'n v. Barry (1889), 131 U. S. 100, 121, 9 S. Ct. 755, 33 L. Ed. 60 (where the insured was injured when he intentionally jumped from a four or five foot platform), with respect to instructions (131 U. S. l. c. 109, 110) to the effect that if an unforeseen or involuntary movement, turn or strain of the body occurred or any

---

[2]On the issue generally, see: 45 C. J. S. 777, sec. 753, 1080, sec. 938 c (1); 29 Am. Jur. 708, sec. 933; 6 Cooley, Briefs on Insurance, 2d Ed., 5233; 5 Couch on Insurance, sec. 1137; 1 Appleman, Insurance Law, secs. 391, 393; Vance on Insurance 871.

unforeseen circumstances changed the expected downward movement and caused a different landing than intended or expected, a resultant injury would be attributable to accidental means; viz.: " . . . the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance; unexpectedly taking place; not according to the usual course of things; or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means.''

Our courts of appeals consider that a death occasioned by sunstroke (or heat stroke) constitutes a death from external, violent, and accidental means within policy provisions of the nature here presented.[3] We denied certiorari (our docket No. 32,843) to review the holding in Farmer v. Railway Mail Ass'n, cited in note 3; insurer's sole contention being that the holding conflicted with the Caldwell case.

Another line of authority is to the effect that although an insured be the aggressor in an assault, i. e., he intentionally enters into it, yet he is charged only with intending that the natural and probable consequences of his acts should follow, and if the resistance he encounters may fairly be said to be beyond reasonable anticipation and injury results, such resistance constitutes [284] an "accidental means" as respects injuries to insured.[4]

Briefly of the main facts in some cases allowing recovery and involving death from freezing: Insured, walking from factory to home in 20 degrees below zero weather, froze his face, stopped at his daughter's and died within a few minutes. Commonwealth Casualty Co. v. Wheeler, 13 Ohio App. 140, 158. Insured alighted from a street car at wrong stop in very cold weather and was found a short distance from home the next morning frozen to death. Wills

---

[3]Farmer v. Railway Ass'n, 227 Mo. App. 1082, 57 S. W. 2d 744; Layton v. Metropolitan L. Ins. Co. (Mo. App.), 89 S. W. 2d 576; Elbe v. John Hancock Mut. L. Ins. Co. (Mo. App.), 155 S. W. 2d 302; Lower v. Metropolitan L. Ins. Co., 111 N. J. 426, 168 Atl. 592, cites many authorities. Consult 45 C. J. S. 826, sec. 787; 29 Am. Jur. 759, sec. 1004; Annotation, 90 A. L. R. 1387, and authorities cited. A different result has been reached in some jurisdictions; for instance, by the United States Supreme Court in Landress v. Phoenix Mut. L. Ins. Co., 291 U. S. 491, 78 L. Ed. 934, 54 S. Ct. 461, 90 A. L. R. 1382.

[4]Eicks v. Fidelity & Casualty Co. of N. Y., 300 Mo. 279, 299(II), 253 S. W. 1029, 1035(II); Berryman v. Southern Surety Co., 285 Mo. 379, 387(I), 227 S. W. 96, 98[1]; Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104, 114, 28 S. W. 877, 880, 47 Am. St. Rep. 638, 30 L. R. A. 209; Podesta v. Metropolitan L. Ins. Co. (Mo. App.), 150 S. W. 2d 596, 598[5]; Camp v. John Hancock Mut. L. Ins. Co. (Mo. App.), 165 S. W. 2d 277, 281 [7 et seq.]; 45 C. J. S. 827, sec. 788; 29 Am. Jur. 736, sec. 980,

v. Midland Nat. L. Ins. Co., 108 Mont. 536, 91 Pac. 2d 695, 698[7, 8]. Insured's wagon became stuck and in unloading coal therefrom for about an hour and a half he froze his fingers. National L. Ins. Co. v. Patrick, 28 Ohio App. 267, 162 N. E. 680, 681[2]. An automobile broke down and insured froze to death while walking in subzero weather. Federal L. Ins. Co. v. White (Tex. Civ. App.), 23 S. W. 2d 832, 834[4]. In most instances the freezing was accompanied by some unforeseen event also operating as a proximate cause.[5]

In Inter-Ocean Cas. Co. v. Foster, 226 Ala. 348, 147 So. 127, 130[5], 131 [8, 9], insured's automobile "gave out of gas on the road" and to protect it against theft he stayed with it for three days and nights in severe Alabama weather, freezing his feet, from which death ensued. Recovery was denied because deceased voluntarily exposed himself to the cold in circumstances "which reasonable and ordinary prudence would pronounce dangerous." The court (citing cases) said: ". . . freezing is not of itself an accident, but becomes so only when 'joined with a fortuitous, unusual, unexpected circumstance or event,' which operating upon the cold weather as a condition produces the result as a proximate consequence of such fortuitous circumstance." See Annotations, 58 A. L. R. 1211, 8 A. L. R. 231, on injury from freezing.

In the following cases recovery was denied on the theory an intoxicated person is held to intend the probable and natural consequences of his acts. Mullaney v. Prudential Ins. Co., 37 F. Supp. 462, 125 F. 2d 900; Kinavey v. Prudential Ins. Co., 149 Pa. Super. Ct. 568, 27 Atl. 2d 286; Winton v. Metropolitan L. Ins. Co., 174 Tenn. 252, 124 S. W. 2d 712; Raven Halls, Inc. v. United States F. & G. Co., 254 N. Y. S. 589, 142 Misc. Rep. 454.

We think the instant case differs from Caldwell v. Travelers' Ins. Co., supra, in that there the court was concerned only with the acts of the insured, he being chargeable with the acts of the surgeon who performed the operation without any mishap; whereas in the instant case we have an extraneous or foreign force, the weather, with which the insured is not necessarily legally chargeable; and whether his freezing was unusual, as well as unintended and unexpected, is a question upon which reasonable minds might differ.

Insurer's witnesses testified that one's resistance to the cold is lessened when intoxicated and also when the affected area of the body is wet. Callahan was out of his automobile and walking in the snow at 1:30 A. M., December 13th, while insurer's witness Chandler was

[5]See also MacKnight v. Federal L. Ins. Co., 278 Ill. App. 241, 244(1); Ashley v. Agricultural L. Ins. Co., 241 Mich. 441, 217 N. W. 27, 58 A. L. R. 1208, 1211; Northwestern Com. Trav. Ins. Co. v. London G. & A. Co., 10 Manitoba 537.

with him. Chandler had on galoshes and they became wet. Perry described Callahan's shoes as "wet or water soaked." When Chandler stopped by for two or three minutes at 2:00 P. M. he did not notice that Callahan's feet were cold or frost bitten, but he paid no particular attention to that feature. If Callahan suffered frost bite during the early morning hours of December 13, we think it was for the jury whether his death was caused by "accidental means" under the [285] authorities mentioned by insurer. Callahan was unfamiliar with the highway. He did not know just where he was. His automobile was stalled and he was out in the snow in his efforts to correct that situation. His shoes and socks became water soaked. If his feet had not bothered him, he would have had no occasion to remove his shoes and socks. It was night time. These inferences, we think, were within the province of the jury. If he chose to remain with his automobile and consumed liquor in an effort to secure relief from the cold, whether mistakenly or not, it should not be held as a matter of law that he intentionally caused his feet to become frozen.

Also we think under the instant record that if Callahan's feet were not frozen until the closing hours of December 13th the issue was for the jury. There is no provision in the instant rider relieving from indemnity in the event the insured be intoxicated (45 C. J. S. 824, sec. 785) or be careless or negligent (Id., 808, sec. 775) or voluntarily expose himself to a known danger (Id., 805, sec. 774). Insurer did not exclude injuries occasioned by these factors from its coverage. He was not violating a law in remaining in his automobile. Several of insurer's witnesses who were acquainted with the instant facts (at least three of them, one the then county health officer and county physician) affirmatively testified that just sitting in the car under the temperature and conditions prevailing on said December 13th would not place one in "any particular danger." The issue appears to be one for the jury.

In its argument insurer says that insured died of tetanus, which according to one of insurer's witnesses, the only testimony on the issue, was not a pyogenic infection, and that insurer was entitled to a directed verdict because the policy excluded death resulting from "bacterial infections (except·pyogenic infections which shall occur through an accidental cut or wound)." No authority is cited. There was testimony that the frost bite had caused "big blebs," "blisters" and "abraded areas" all over the soles of insured's feet; that the tetanus infection entered through these areas, and that if insured had not suffered the frost bite he would not have had fatal results. The tetanus was but a link in the causative chain between the accident, which gave rise to the tetanus, and the death, which the

tetanus produced. In such circumstances a finding that the death is the result of the accident is warranted.[6]

Plaintiff offered in evidence a certified copy of the death certificate of insured. It read, in part, as follows: "22. . . . (a) Accident, suicide, or homicide (specify). *Accident* . . . (e) Means of injury. Got wet feet." Dr. Ogilvie executed the death certificate. His testimony showed he was not present when insured was injured and insurer, recognizing the certificate generally was competent prima facie evidence, objected to the answers italicized above on the specific ground, among others, that they were not statements of fact. Section 9766, R. S. 1939, after calling for certain data within the knowledge of the attending physician, provides that the causes of death "shall be carefully defined; and, if from violence, its nature shall be stated, and whether (probably) accidental, suicidal, or homicidal." Section 9781, Id., provides that a duly certified death certificate "shall be prima facie evidence in all courts and places of the facts therein stated." There are divergent lines of decisions with respect to the extent such certificates are admissible in litigation between private persons, and particularly on the necessity of personal knowledge on the part of the physician making the record.[7] Factors other than statutory provisions are sometimes determinative. [826] We think it settled with respect to such answers invading the province of the jury, being self-serving and hearsay that the legislature has authority to change the rules of evidence (Simpson v. Wells, infra), and, as we view it, the only issue is whether the answer "accident" is a fact or not a fact within Sec. 9781, supra.

Simpson v. Wells (Div. II), 292 Mo. 301, 316 (II, IV, V), 237 S. W. 520, 523[2-4, 6, 7], reviewed earlier Missouri cases and held the following answer respecting the primary and contributory causes of death (Sec. 9766, supra, item 17) admissible: "(17) I hereby certify that death occurred on the date stated above, at 8:25 A. M. The cause of death was as follows: Shock, and injuries, traumatic amputation of both feet, due to street car." The court, it being undisputed that defendant's street car collided with deceased and ran over his feet, considered that the quoted statements were not mere conclusions and did not improperly invade the province of the jury or cut off the right of cross-examination; reasoning that the legislature had authority to make the matters called for in a death certificate prima facie evidence.

[6]Western Com. Trav. Ass'n v. Smith, 85 Fed. 401, 40 L. R. A. 653, 656; Aetna L. Ins. Co. v. Kelley, 70 Fed. 2d 589, 93 A. L. R. 471, 481[12]; Wheeler v. Fidelity & Cas. Co., 298 Mo. 619, 642, 251 S. W. 924, 930[2]; Bellows v. Travelers' Ins. Co. (Mo.), 203 S. W. 978, 981[1].

[7]Consult: 46 C. J. S. 482, sec. 1337 c (1) (2); 32 C. J. S. 495, sec. 638 b, 509, sec. 644; 29 Am. Jur. 1116, sec. 1489; 20 Am. Jur. 869, secs. 1030, 1034; 5 Wigmore on Evidence (3rd Ed.), secs. 1645, 1646; Annotations, 96 A. L. R. 324, 42 A. L. R. 1454; 17 A. L. R. 359.

In Griffith v. Continental Cas. Co. (Banc), 299 Mo. 426, 443(5), 253 S. W. 1043, 1048[7], a similar certificate of death was admitted (upon reference to the files) over a general objection that the certificate was incompetent, without probative force, being ex parte, and not connected with plaintiff-beneficiary. Simpson v. Wells, supra, was followed, being the only authority, aside from the statute, cited. The instant issue was not before the court and the court correctly ruled the issue there presented.[8]

The whole of a similar certificate, however, is not admissible in every event. The statement in the attending physician's certificate that death was caused by cerebral hemorrhage of a duration, to his personal knowledge, of three days, and, from history given, of eight months, was held no evidence of the fact that death was occasioned by a fall eight months prior to relieve insurer of liability for vexatious delay. Childers v. National L. & Acc. Ins. Co. (Mo. App.), 37 S. W. 2d 490, 492[8]. See Basham v. Prudential Ins. Co., 232 Mo. App. 782, 788, 113 S. W. 2d 126, 130[6]. Statements of matter not required by the statute are not admissible. Reynolds v. Prudential Ins. Co., 88 Mo. App. 679, 684; 32 C. J. S. 509, n. 23. A certificate executed by one having no personal knowledge of the facts whatsoever is inadmissible. Thrower v. Life & Cas. Ins. Co. (Mo. App.), 141 S. W. 2d 192, 197[11]. Consult Commercial Bank v. Barksdale, 36 Mo. 563, 572.

The statements required of the attending physician are usually facts within his personal knowledge. In cases of death from violence its nature is to be stated, likewise within his knowledge, "and whether (probably) accidental, suicidal, or homicidal." The quoted portion is to classify the death for statistical purposes under the international classification of causes of death. Dow v. United States F. & G. Co., 297 Mass. 34, 7 N. E. 2d 426, 428[1]. The wording of Secs. 9766 and 9781 distinguish between fact and opinion. Thus, the lawmakers recognized that whether a death was accidental, suicidal or homicidal would not be within the personal knowledge of the physician and his statement in respect thereto was to be his opinion, his "probable" conclusion, and not a statement of fact The meaning of the terms "accident" or "accidental" in their ordinary and popular sense differs greatly from their meaning in the policy before us under the Missouri law. The purpose of this litigation is to determine whether in-

[8]Other holdings to like effect are: Guardian v. Kissner, 111 Fed. 2d 532, 534[4]; Jones v. Mutual L. Ins. Co., 113 Fed. 2d 873, 877[4], and cases cited; Loughlin v. Marr-Bridger Grocer Co. (Mo App.), 10 S. W. 2d 75, 82[16]; Dow v. United States F. & G. Co., 297 Mass. 34, 7 N. E. 2d 426, 428[1, 2]; Caccamo's Case, 316 Mass. 358, 55 N. E. 2d 614; Branford Trs. Co. v. Prudential Ins. Co., 102 Conn. 481, 129 Atl. 379, 42 A. L. R. 1450 (stating the jury should be cautioned not to permit the conclusion to take the place of their own); Bozicevich v. Kenilworth Merc. Co., 58 Utah 458, 199 Pac. 406, 407[1, 5], 17 A. L. R. 346.

sured's death was an "accident" as defined by the policy provisions. In the popular [287] concept of the terms insured's injuries indicate they were not the result of suicidal or homicidal intent and the physician's choice of answers was restricted. Section 9766 seeks a conclusion based on probabilities respecting a violent death being accidental, suicidal or homicidal, and the answer not being a "fact" is not made admissible as "prima facie evidence" by Section 9781. This conclusion is supported by Schmidt v. Supreme Council of Royal Arcanum (Mo. App.), 207 S. W. 874, 875, 876[2] (quoted and not disapproved in Simpson v. Wells, supra) ; and cases mentioned in the margin.[9] The Missouri cases of Simpson v. Wells and Griffith v. Continental Cas. Co., supra, did not rule the instant issue. In Wheeler v. Fidelity & Cas. Co (Banc), 298 Mo. 619, 640, 251 S. W. 924, 929[1], the author of the Griffith case, said: "It is true that a mere probability is not proof . . . ." We think the broad statement in Simpson v. Wells, 292 Mo. l. c. 322, 237 S. W. l. c. 525, that all matters required to be stated in the certificate are prima facie evidence should be restricted to statements of fact.

■ We are not impressed with insurer's other contentions respecting the improper admission of evidence as calling for a new trial under the record before us. Insurer refers us to no supporting authority. Among the more prominent complaints is that against evidence of blebs, abrasions, scratches and cuts (as described by the different witnesses) beginning to show up on insured's feet. There was testimony that this was the natural progress of frost bite. The policy conditioned payment of the indemnity upon proof of a "visible contusion or wound on the exterior of the body." The evidence was admissible. Some evidence admitted appears to be subject to the criticism it was hearsay and self-serving. We think we need not develop it.

■ The insurer says that plaintiff's instructions Nos. 3 and 4 deprived it of its defense that insured's death was not the result of bodily injuries effected through accidental means.

These instructions told the jury that even though they found and believed from the evidence that insured "was negligent and careless in staying in his automobile and that he used poor judgment in his

[9]Seater v. Penn Mut. L. Ins. Co., 176 Ore. 542, 156 Pac. 2d 386, 389[2], reviews many earlier cases, including: New York L. Ins. Co. v. Anderson, 66 Fed. 2d 705, 706[1]; Equitable L. Assur. Soc. v. Stinnett, 13 Fed. 2d 820, 822; Gilchrist v. Mystic Workers, 188 Mich. 466, 154 N. W. 575, 577[2]; Life Ins. Co. v. Brockman, 173 Va. 86, 3 S. E. 2d 480, 482[3]; Rees v. Jefferson Stand. L. Ins. Co., 216 N. C. 428, 5 S. E. 2d 154, 155[4]; Greenberg v. Prudential Ins. Co , 40 N. Y. S. 2d 494 (citing New York cases). The instant certificate omitted the word "probably" used in the statute. See Morton v. Equitable L. Ins. Co., 218 Iowa 846, 254 S. W. 325, 96 A. L. R. 315, 320; Equitable L. Assur. Soc. v. Stinnett (6th Cir. Ky.), 13 Fed. 2d 820, 822. Compare Troutman v. Mutual L. Ins. Co. (6th Cir. Ky.), 125 Fed. 2d 769, 772[6, 7].

actions'' (No. 3) or that insured ''was grossly negligent in exposing himself to the cold . . . and that his negligence was caused by his drinking and intoxication,'' (No. 4)‧ such facts, even if true, ''would constitute no defense to plaintiff's claim nor prevent his [insured's] death from being accidental.''

The litigants seemingly agree that under the policy insured's negligence, or intoxication, or lack of judgment was not an element of plaintiff's cause of action or insurer's defense. Plaintiff cases[10] contain observations to this effect but do not rule on the propriety of such instructions under like policy provisions.

The facts of the instant case differ from those ordinarily presented in like litigation. Usually some unexpected and sudden event causes the injury. The Missouri cases involving [288] sunstroke differ from the freezing cases cited hereinbefore in that in the freezing cases allowing recovery some accidental means operated as a proximate cause to an involuntary exposure to the cold, freezing of itself being considered not necessarily an accident. See Inter-Ocean Cas. Co. v. Foster, supra. A frequently quoted and leading case involving a sunstroke (Bryant v. Continental Cas. Co., 107 Tex. 582, 182 S. W. 673, 677, L. R. A. 1916 E, 945, Ann. Cas. 1918 A, 517) recognizes that a sunstroke may result from other than accidental means. See quotation in Farmer v. Railway Mail Ass'n, 227 Mo. App. 1082, 1089, 57 S. W. 2d 744, 747.

In Mullaney v. Prudential Ins. Co. (Fla.), 125 Fed. 2d 900, 901, insured was found lying in a private driveway and intoxicated. The owners were unable to arouse him and entered their home. Insured soon arose and began to curse the husband and wife and tried to enter the house. The owner, after repeatedly warning insured not to enter, shot and killed him. The court denied recovery as a matter of law; reasoning that: ''An effect that is the natural and probable consequence of a voluntary act is not produced by accidental means . . . when one, who is the aggressor in an altercation from which a fatal injury reasonably might or should be expected to result, is killed, the death is not to be considered accidental. . . . We conclude that the normal and probable consequences of an act may not be considered accidental, within the policy provisions, solely by reason of the fact that the actor was voluntarily incapacitated from discerning with normal clearness what might or might not be expected

[10]Morris v. Equitable Assur. Soc., 340 Mo. 709, 717, 719, 102 S. W. 2d 569, 572[4, 5]; Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104, 114, 28 S. W. 877, 879 (quoting Schneider v. Provident L. Ins. Co., 24 Wis. 28); Curtis v. Indemnity Co. of Am., 327 Mo. 350, 376, 37 S. W. 2d 617, 628[17]; Ingle v. Woodmen of the World, 204 Mo. App. 597, 606, 216 S. W. 787, 790; Bateman v. Travelers' Ins. Co., 110 Mo. App. 443, 449, 85 S. W. 128, 129; Powell v. Travelers' Protective Ass'n, 160 Mo. App. 571, 140 S. W. 939.

to result therefrom.''[11]   This case affirmed 37 Fed. Supp. 462, 463, which stated: ''From the beneficiary's standpoint, the drunker the better'' is not the law.   ''An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means.'' 6 Cooley, Briefs on Insurance, 2d Ed., p. 5234.

The foregoing cases apply the definition of accidental means quoted hereinbefore from the United States Supreme Court in U. S. Mutual Acc. Ass'n v. Barry and also applied in Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 660, 267 S. W. 905, 916, 39 A. L. R. 56.   In Lovelace v. Travelers' Protective Ass'n, 126 Mo. 104, 114, 28 S. W. 877, 879, cited by plaintiff, the court remarked that insured had ''no cause, or reasonable ground, to anticipate that he would be shot or killed,'' when the difficulty arose.   In a case wherein the insured commenced a brutal assault on his wife, announcing an intention to kill her, and was fatally shot while pressing his assault, the St. Louis Court of Appeals stated: ''.   .   .   The true test of the insurance company's liability under such general circumstances as we have before us is whether the insured's injury or death was the natural and probable consequences of his aggression or other intentional misconduct   .   .   .   '' Podesta v. Metropolitan L. Ins. Co., 150 S. W. 2d 596, 598[4].

Insurer contends that insured's acts amounted to more than mere negligence; that they were willful and voluntary; that of his own volition, long continued, insured remained in his automobile for approximately twenty-four hours with the temperature below freezing until he froze his feet; that during that time he was within a few feet of a busy highway and a few hundred yards of a community with assistance readily accessible; that in these circumstances he is charged with the natural and probable consequences of his acts; and, whether insured was drunk et cetera or not, insurer was entitled to have the jury consider all the facts and circumstances in evidence in determining whether insured's death was the result of bodily injuries effected directly and independently of all other causes through accidental means.   Instructing the jury that insured's negligence and carelessness and use of poor judgment and his intoxication, in the event they found such to be the facts, would not constitute any defense or prevent his death [289] from being accidental, minimized these factual matters if it did not withdraw them entirely from the consideration of the jury in passing upon the contested issue in the case.   The instructions should not have been given.

[11]To like effect: Kinavey v. Prudential Ins. Co., 149 Pa. Super. Ct. 568, 27 Atl. 2d 286, 287[3-6]; Winton v. Metropolitan L. Ins. Co., 174 Tenn. 252, 124 S. W. 2d 712, 713; Raven Halls, Inc. v. United States F. & G. Co., 254 N. Y. S. 589, 142 Misc. Rep. 454.

Insurer contends it was entitled to refused instruction "C", as we understand, to offset given instructions Nos. 3 and 4, particularly No. 4. Our holding that instructions Nos. 3 and 4 should not have been given disposes of the contention.

█ A reason assigned for granting a new trial was the giving of instructions permitting of a lump sum verdict. Certain portions of the contract of insurance should be set out to understand the issue. The policy and the several riders all bear date of January 2, 1939. Each rider is attached to and expressly made a part of the policy. (The italics are ours.) Under the original policy insurer "agrees to pay at its home office in Hartford, Connecticut: Twenty-five Hundred Dollars to Roberta Callahan, wife of the insured, if living; otherwise to Norma L. Callahan, daughter of the insured, if living, *as provided in the Family Income rider* attached hereto, provided, however, that any proceeds payable thereunder on or after January 2, 1959, shall be paid to the Connecticut General Life Insurance Company, Trustee under agreement of Trust No. TA 38363, (hereinafter called beneficiaries) upon receipt of due proofs of death of the insured . . ."

The "Additional Indemnity" rider quoted in note 1, supra, provided for double indemnity in the event death resulted from accidental bodily injuries ". . . upon receipt at its Home Office of due proofs thereof . . ."

The "Family Income" rider provided:

"1. In the event of the death of the Insured prior to the 2nd day of January, 1959 (hereinafter called the Termination date), *the proceeds of this policy*, instead of being payable in one sum as provided on the first page of the policy, shall be retained by the Company and interest instalments thereon at the rate of $2.46 for each One Thousand Dollars of proceeds shall be paid monthly in advance unto the Beneficiary named in the policy . . . . . .

"6. In determining the proceeds and interest instalments thereon as set forth in Section 1, any indebtedness to the Company against the policy at the time of the death of the Insured (unless such indebtedness be immediately repaid to the Company), shall be deducted from, *and any amount payable in addition to the original face amount of insurance shall be added to such original face amount,* . . ."

Plaintiff contends that insurer's liability under the Additional Indemnity rider is separate from its liability under the ordinary life provisions and, consequently, the instructions authorizing a lump sum verdict were proper. The Additional Indemnity rider is expressly made a part of the policy and provisions therein refer to "this policy." Reference to other policy provisions is necessary for provisions material to the Additional Indemnity rider. It does not provide when its premium is payable, or where, or in what manner or the beneficiary to whom the double indemnity is payable. Plaintiff must refer to the original policy for her claim to the double

indemnity as beneficiary. Section 1 of the Family Income rider refers to "the proceeds of this policy" of which the Additional Indemnity rider is a part; and Section 6 of the Family Income rider states that "any amount payable in addition to the original face amount of insurance shall be added to such original face amount." Plaintiff has failed to sustain her position and to establish error in granting a new trial for the ground under discussion.

We think insurer's contention that Sec. 6040, R. S. 1939, is unconstitutional as imposing an undue burden upon interstate commerce in violation of Sec. 8, Art. I, of the Constitution of the United States not well taken. It was stipulated that the insurer operates across state lines; and the contention arises from the comparatively recent decisions of the United States Supreme Court to the effect that the insurance business is commerce and that an interstate insurance business is interstate commerce. United States v. Southeastern Underwriter's Ass'n (Jan. 11, 1944), 322 U. S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440; Polish National Alliance v. National Labor Relations Board (June 5, 1944), 322 U. S. 643, 64 S. Ct. 1196, [290] 88 L. Ed. 1509. The verdict in this case was returned on July 19, 1945. On March 9, 1945, Congress provided: "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 59 Stat. 33, c. 20, sec. 1; 15 U. S. C. A., sec. 1011. Section 6040 is in force and effect.

The record shows good faith on the part of the insurer in contesting the claim. The case presents interesting questions of fact and of law. In these circumstances insurers may ask for a judicial determination of their liability without becoming subject to the statute respecting vexatious delay. Volz v. Travelers Ins. Co. (Mo. App.), 161 S. W. 2d 985, 994[6-9]; Sanderson v. New York L. Ins. Co. (Mo. App.), 194 S. W. 2d 221, 228[16-19]; Camdenton Consol. Sch. Dist. v. New York Cas. Co., 340 Mo. 1070, 1092, 104 S. W. 2d 319, 331[10, 11]; Camp v. John Hancock Mut. L. Ins. Co. (Mo. App.), 165 S. W. 2d 277, 283[17].

The order granting a new trial is affirmed and the cause is remanded in conformity thereto. *Westhues* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.