**Donita J. HERBST, Plaintiff-Appellant,**

v.

**J.C. PENNEY INSURANCE CO., Defendant-Respondent.**

**No. 13667.**

Missouri Court of Appeals, Southern District, Division Two.

Sept. 6, 1984.

Motion for Rehearing Overruled and Transfer to Supreme Court Denied Sept. 20, 1984.

Application to Transfer Denied Nov. 20, 1984.

Daniel T. Moore, L. Joe Scott, Daniel T. Moore, Poplar Bluff, for plaintiff-appellant.

James E. Spain, Dale E. Nunnery, Hyde, Purcell, Wilhoit, Spain, Edmundson & Merrell, Poplar Bluff, for defendant-respondent.

PREWITT, Chief Judge.

At dispute is whether plaintiff should receive accidental death benefits because of the death of her father under an insurance policy issued by defendant. The trial court awarded her ten thousand dollars which the policy provided that defendant was to pay upon his death, but she was denied recovery of an additional thirty thousand dollars payable if "the Insured's death re-

sulted directly and independently of all other causes from accidental bodily injury".

Plaintiff's father, Don Barkley, was shot and killed by his wife, Mary Beth Barkley. Mrs. Barkley said she shot him because she was fearful of a severe beating which he was threatening. The trial court found "that the decedent knew or should have known that his conduct, in making such an assault, would have resulted in the use of deadly force by Mary Beth Barkley."

The parties agree upon the law, but disagree upon the result that it calls for. Both parties cite *Stogsdill v. General American Life Insurance Company*, 541 S.W.2d 696, 699 (Mo.App.1976). There the opinion states:

"[I]n determining if a death is accidental for insurance policy purposes where the insured has voluntarily exposed himself to peril, the keystone is whether death is unforeseeable and unexpected or whether a natural or probable consequence of the insured's actions. Where the danger to which the insured has caused himself to be exposed is by reason of resistance to his own aggression, the foreseeability of death is determined by the character of the aggression and of the resistance likely to be employed in repelling that aggression. [citing cases] Thus, the mere fact that the insured may have been the aggressor in an altercation ultimately leading to his death does not preclude recovery by a beneficiary. If the beneficiary proves that the resistance offered by the person being assailed was not of the kind or degree that should have been reasonably anticipated by the insured from the character of the initial aggression, the beneficiary may be entitled to recover under the provisions of the accidental death policy. [citing case] The converse situation, where the insured's assault invites deadly retaliation, would preclude accidental death benefit recovery. [citing cases] If reasonable minds differ as to the foreseeability of death resulting from the insured's action, a jury question exists."

Other cases where there was evidence that the decedent may have started an al-

tercation resulting in his death and accidental death benefits were claimed include *Di Paoli v. Prudential Insurance Company*, 384 S.W.2d 861 (Mo.App.1964), *Camp v. John Hancock Mut. Life Ins. Co.*, 165 S.W.2d 277 (Mo.App.1942), and *Hopkins v. Metropolitan Life Ins. Co.*, 151 S.W.2d 527, 531 (Mo.App.1941). See also *Piva v. General American Life Insurance Company*, 647 S.W.2d 866 (Mo.App.1983), and *Connizzo v. General American Life Insurance Company*, 520 S.W.2d 661 (Mo. App.1975) (Benefits not payable if decedent participating in an assault or felony).

The decedent and his wife lived in Fremont, Missouri. Mr. Barkley left their house around 8 o'clock a.m. on July 30, 1982. He called about 10:30 that night and she talked to him for a short period. He did not say anything about "his intent once he got home".

He arrived in front of the house on July 31st around 12:30 a.m. He parked the truck in front of the house and stayed outside probably five or ten minutes.

Mrs. Barkley testified she went out to the vehicle and "asked him why he didn't get out and come in the house." She said he told her to leave him alone "or he was going to cut my head off with his pocketknife, that he was drunk." She went back in the house, locked the doors, and put chairs under the doorknobs of the front and back doors. She then sat down in the living room.

After about 5 minutes he "came to the front door and started cussing and wanted me to let him in." She replied that she "wasn't going to let him in." He then said he "was going to beat" her. He struck the front door several times and then went to the back door and "went to kicking down the door".

Mrs. Barkley then went in the bedroom with her two-year-old daughter and locked its door because she "was afraid" and "knew he was going to beat" her. After she locked herself in the bedroom he kicked in the back door and came in the house "cursing loudly". She said "He was just calling me a dirty bitch and telling me I was crazy and he was going to beat my

head off and that I was stupid and that was just over and over about the same thing."

She heard him coming down the hallway. When he got to the door leading into the bedroom he tried to open it. She picked up a rifle in the closet and got as far away from the door as she could. There was no way to leave the bedroom except from the door he was trying to force open.

She said he "grabbed the knob and went to rattling it and told me if I didn't open the door he was going to beat me. And I just told him I wasn't going to open the door. And he went to kicking on the door." She said he forced the door open and started in, and she "threw the gun up and pulled the trigger." She did so because she "was afraid. I knew I couldn't stand another beating." She said when he started into the bedroom, she was "frightened" and "knew he was going to beat me." That was based upon "past experience and what he had said."

She said he had previously beaten her several times. The last time was on the 25th of May that year. She reported that beating to the police. He would beat her "only when he was drinking." She was sure he was drunk "because if he hadn't of been drunk, he would never have said anything. He never said a cross word to me unless he was drinking." In the past when he had beat her, she had never "fought back or attempted to harm him in any way". She said she was not as strong as he and not able to defend herself from him.

Plaintiff contends that as deceased had not met any resistance when he had beaten her before, he could not have anticipated that any resistance would be of a deadly nature, and thus his death was unexpected and unforeseeable. She also contends that his drunken state would have prevented him from realizing that his wife might use force to defend herself.

We believe what could be anticipated is not to be based on what Mr. Barkley might have believed in his affected condition but what a reasonable person ordinarily would

expect by such conduct. A similar contention was rejected in *Callahan v. Connecticut General Life Ins. Co.*, 357 Mo. 187, 207 S.W.2d 279, 287–289 (1947). There the court quoted from *Mullaney v. Prudential Ins. Co.*, 125 F.2d 900, 901 (5th Cir.1942) that "the normal and probable consequences of an act may not be considered accidental, within the policy provisions, solely by reason of the fact that the actor was voluntarily incapacitated from discerning with normal clearness what might or might not reasonably be expected to result therefrom." *Mullaney* involved voluntary intoxication.

■ The Missouri cases cited previously in the opinion indicate that the criterion is what a reasonably prudent person, not intoxicated, might anticipate and that appears to be the general rule elsewhere. The test is whether the action of the insured is such that a reasonable person would conclude that danger of serious injury might result. *Lincoln Income Life Insurance Company v. Alexander*, 231 Ark. 63, 328 S.W.2d 266, 270 (1959). When an insured assaults another and is killed as a consequence, his death is accidental, unless it was the natural and probable result of his own actions, reasonably foreseeable by him or by a reasonably prudent man in his position. *Yeager v. Travelers Insurance Company*, 515 P.2d 117, 119 (Colo.App. 1973); 43 Am.Jur.2d, Insurance, § 588, p. 653.*

*Yeager*, supra, indicates that had the trial court reached a different result, that finding would have been upheld. *Yeager* states "other courts likewise have taken the position that a long history of a wife's passive submission to attacks and beatings by her husband supports the finding that he did not reasonably foresee that she would use armed force to resist him [citing authorities]." 515 P.2d at 119.

■ We are not convinced that because she had not resisted before we can say as a matter of law that he could reasonably believe she would never do so. Photographs of Mrs. Barkley reveal that she was

---

\* Mental illness of the decedent might call for a different standard. See *Hoffman v. Life Insur-* *ance Company of North America,* 669 P.2d 410 (Utah 1983).

severely beaten on May 25th. A wife might tolerate such abuse for awhile, believing it may end and when it does not, react strongly. Whether the growing independence of women changes the rule stated in *Yeager* and the authorities it relies on need not be decided here. On these facts we cannot say that the trial court erred in finding that the decedent knew or should have known that his conduct might result in the use of deadly force by his wife.

A person who is vastly superior in size and strength, and who makes threats to kill or seriously batter another, should anticipate that if available, a deadly weapon might be used against him. It is reasonable to assume that Mr. Barkley knew the rifle was in the closet of that room. At the least we believe that reasonable minds could differ on the foreseeability of death resulting from Mr. Barkley's actions, making it a question for the trier of facts.

The judgment is affirmed.

HOGAN, P.J., and MAUS and CROW, JJ., concur.