**Kenneth V. DUCK, Plaintiff,**

v.

**FIRST ASSURANCE LIFE OF AMERICA, Defendant.**

**No. 3:95–CV–301(L)(N).**

United States District Court,
S.D. Mississippi,
Jackson Division.

March 28, 1996.

T. Patrick Welch, McComb, MS, for plaintiff.

Kathy S. Boteler, Don W. Moore, Kirkland, Barfield & Moore, Jackson, MS, for defendant.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the motion of defendant First Assurance Life of America (First Assurance) for summary judgment or, in the alternative, for partial summary judgment on the issue of punitive damages. Plaintiff Kenneth W. Duck has responded in opposition to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that defendant's motion for summary judgment should be granted.

The facts relevant to defendant's motion are undisputed. On October 12, 1994, in connection with his purchase of a vehicle from Hollingsworth Mazda in Baton Rouge, Louisiana, Kenneth Duck obtained a credit insurance policy with First Assurance. Later that same day, Duck was seen by Dr. Lawrence J. Messina at Our Lady of the Lake Hospital in Baton Rouge for a pre-scheduled appointment concerning the osteoarthritis of Duck's left knee. At that time, Dr. Messina apparently recommended a total knee replacement and approximately two weeks later, on October 28, 1994, Dr. Messina performed the knee replacement surgery. Duck was reported to have tolerat-

ed the procedure well, and to have been recovering nicely both immediately after the procedure and in his initial follow-up visits to Dr. Messina. However, on November 25, 1994, Duck developed a staph infection at the surgery site which necessitated further surgeries and an extended period of recovery. And Duck, who according to Dr. Messina would under normal circumstances have been unable to work for the two to three months following the knee replacement surgery,[1] was as a consequence of the staph infection unable to return to work until March 29, 1995, some five months later.

During February 1995, Duck filed a claim with First Assurance for credit disability benefits, claiming disability resulting from "knee replacement; staph infection; legiment [sic] recon." On the claim form, Duck indicated that he was first treated for the illness, and that his illness began October 28, 1994. Duck's claim form was accompanied by a form entitled "Statement of Attending Physician" which, under the heading "Nature of sickness or injury," stated "osteoarthritis knee STP TKR c sepsis." Upon receiving Duck's claim, defendant's claims department requested, received and reviewed copies of his medical records from Our Lady of the Lake Regional Medical Center and from Dr. Messina. Then, on April 5, Joseph J. Rohal, defendant's claims manager, wrote to plaintiff explaining that First Assurance was denying his claim as a preexisting condition for which the policy provided no coverage. Mr. Rohal explained:

> Under the provisions of the above policy, it does not provide disability benefits for a preexisting illness, disease, injury or physical condition (whether or not by name or specific description) of which the applicant for insurance was aware of or knew of the existence of or had been treated for within the six (6) months immediately preceding the effective date of their coverage. Accordingly, since the medical records that

have been forwarded to us document that the condition for which you are claiming disability had it's [sic] onset prior to the effective date of the above policy, no benefits would be due on your claim.

After receiving this letter, Duck retained an attorney and on May 15, 1995, instituted the present action alleging that defendant breached the insurance contract, entitling him to $1416.68 in policy benefits (for the period from November 21, 1984 through the date he returned to work in March 1995), and charging that defendant's denial of benefits was in bad faith, for which plaintiff demanded punitive damages of $500,000.

While plaintiff initially claimed disability benefits based on his "knee replacement; staph infection; legiment [sic] recon," he no longer claims benefits for any period of disability attributable solely to his knee replacement. Apparently, he has come to recognize that, in fact, the osteoarthritis which necessitated the knee replacement was a preexisting condition that is not covered by the First Assurance policy.[2] Nevertheless, he maintains that the staph infection, which rendered him disabled at least from November 25, 1994, is not excludable as a preexisting condition under the policy.

The policy at issue provides for payment of a monthly disability benefit "[i]f the Insured Debtor becomes totally disabled while the insurance is in effect." To qualify for coverage, the total disability "must result from a sickness or injury" that is not excepted from coverage. Under the "Exceptions" provision, the policy states, "This certificate does not provide any ... Monthly Disability Benefits resulting from ... a preexisting illness, disease, injury or physical condition (whether or not by name or specified description) of which the applicant for insurance was aware of or knew of the existence of or had been treated for within six months immediately preceding the effective date of their coverage."

---

1. The court notes that in contrast to Dr. Messina's testimony, plaintiff's affidavit recites that Dr. Messina had told him that the convalescence period from the surgery would be about four weeks.

2. That the osteoarthritis was preexisting is undeniable. Medical records from Dr. Niels J. Linschoten at Oschner Clinic dated May 10, 1994, five months before plaintiff applied for the First Assurance coverage, detail his knee condition and observe that Duck "is a candidate for a total knee replacement in the long run."

While it is clear that Duck had not been treated for a staph infection within the six months preceding the effective date of coverage under the policy, defendant reasons that Duck's staph infection "resulted from" a preexisting condition because, but for Duck's preexisting knee problems, he would not have been required to undergo knee replacement surgery and would not have contracted the staph infection. Indeed, the medical evidence of record indicates that Duck would not have had the staph infection if he had not had the surgery.[3] Plaintiff, however, disputes defendant's reasoning.

While the parties agree that there are no Mississippi cases (or for that matter cases from any jurisdiction), which address the precise issue before the court, both have presented cases which they contend support their positions by analogy. Defendant cites cases that have found death to have resulted from an accident (so as to be covered under a policy's accidental death coverage) where an accident caused an injury which in turn caused an infection which resulted in death. See, e.g., Metropolitan Life Insurance Co. v. Williams, 180 Miss. 894, 178 So. 477, 478 (1938). Plaintiff, on the other hand, offers cases finding that an accident or injury caused a loss or death, rather than a disease (which would not have been covered) where the accident or injury merely aggravated a preexisting disease. That is, where the loss resulting from an accident or injury was rendered more likely due to a preexisting disease, the accident or injury, and not the disease, was said to be the cause of the loss. See, e.g., DeCuir v. Old Republic Life Ins. Co., 342 So.2d 705 (La.Ct.App.1977).

While the issue presented is not altogether free from doubt, the proper construction of the terms of the policy is a legal issue for the court to decide. And in the court's opinion, defendant makes the more compelling argument. In the Metropolitan Life case cited by defendant, the insured received an injury to his hand, at the site of which he subsequently developed an infection which resulted in his eventual death. The court concluded that the insured's death was the result of accidental means, reasoning as follows: "It appears ... that the active cause of the death was the accident, and that the accident precipitated the other troubles; that, had the accident not occurred, death would not have resulted for some years." Id. 178 So. at 482. In another case cited by defendant, Nieman v. Aetna Life Insurance Co., 83 F.2d 753 (6th Cir.1936), the insured was injured in an automobile accident and was taken to the hospital, where he developed various infections which the proof showed were the immediate cause of his subsequent death. The appeals court overturned the lower court's verdict for the insurer, and held that even though the policy at issue excluded coverage for death resulting from bacterial infection, the insured's death was attributable to the accident rather than the disease. Id. at 755. The court observed, "The general principle that death or disability resulting from and not concurrent with an injury arises solely from the injury is laid down in many decisions." Id. (citations omitted). Thus, the court concluded, "If an accidental injury sets in motion all of the succeeding agencies which contribute to the result, then the accidental injury is the efficient producing cause of all of the succeeding agencies, and the sole proximate cause of the disability or death." Id. See also Guarantee Trust Life Ins. Co. v. Overton, 50 Ala.App. 435, 280 So.2d 140, 145 (Ala.Civ.App.1973) (jury was warranted in concluding that insured's death was "due to the results of an accidental injury which in turn permitted staph germs to enter the body" and ultimately caused his death); Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 207 S.W.2d 279, 285 (1947) (coverage found under accidental death policy with exclusion for death from bacterial infection where insured's frost bite allowed tetanus infection to enter his body from which infection he died; "The tetanus was but a link in the causative chain between the accident, which gave rise to the tetanus and the death, which the tetanus produced.").

The only basis offered by plaintiff for rejecting as inapplicable the principle espoused

---

**3.** Dr. Messina testified by deposition that the likely portal of entry for the staph infection was the surgical incision. He stated that in light of that fact, then "if [Duck] didn't have the artificial knee put in, he would have never become infected."

in these cases is his unexplained assertion that the cases "only address conditions that actually existed on the effective date." While the basis for this statement eludes the court, the court does recognize that the cited cases do not address the issue of causation in the context of a preexisting condition exclusion. Nevertheless, the court is persuaded that the reasoning of these cases is no less applicable in the present circumstance. Duck's preexisting condition set in motion the chain of events culminating in the staph infection, which by the causal chain, is directly linked to the preexisting knee condition. Thus, his disability because of the staph infection is properly said to have "resulted from" his preexisting osteoarthritic knee condition.[4]

Having concluded that plaintiff's claim for breach of contract will be dismissed, it follows that his further claim for bad faith denial of benefits fails as well. Defendant, in fact, had a legitimate and arguable basis for denying plaintiff's claim, and plaintiff has otherwise offered no evidence that defendant acted maliciously or recklessly with regard to his claim.

Based on the foregoing, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.

---

**4.** The only case which this court has found directly addressing this issue is *Harrell v. Old American Ins. Co.*, 829 P.2d 75 (Okla.App.1991). In *Harrell*, as in the present case, the insured developed an infection as a result of surgery for a preexisting condition. The court there affirmed a jury's verdict finding coverage under the insured's hospitalization policy, as well as bad faith denial of benefits. In *Harrell*, however, the finding of coverage was apparently based upon an ambiguity in the policy deriving from a potential conflict between its insuring and exclusion provisions. Whereas the policy did include an exclusion for preexisting conditions, it also provided coverage for hospitalization resulting from sickness, which it defined as "sickness or disease which *first manifests itself after the effective date.*" The insured's infections fell within the coverage provision, and were not specifically excluded. *Harrell*, 829 P.2d at 79. No similar ambiguity exists here.